The defendant, Herbert Williams, Jr., was convicted of capital murder in regard to the 1988 death of Timothy Hasser and was sentenced to death by electrocution. The Court of Criminal Appeals affirmed, Williams v. State, 627 So.2d 985
(Ala.Cr.App. 1991). This Court granted certiorari review. Rule 39, Ala.R.App.P.
The facts of this case, as set out by the Court of Criminal Appeals, are, for the reader's convenience, repeated below:
 "The state's evidence tended to show the following: On November 2, 1988, the body of the victim, Timothy Hasser, was found in the back of his 1980 Porsche automobile. He had been shot three times in the head. Officer Mark Harrell, of the Jackson Police Department, stated that he was on routine patrol on the evening of November 2, 1988, when he spotted a white Porsche in the emergency lane on Highway 43, by the McCorquodale Bridge, near the city of Jackson, in Alabama. Harrell approached the car, and a man, who Harrell identified as the appellant, exited from the driver's side. The appellant told the officer that he had a 'lemon of a car' and that he needed to go to a gasoline station. Officer Harrell followed the appellant to a nearby station. *Page 1001 
While he was following the Porsche, Harrell noticed a thick dark liquid, which he later identified as blood, dripping from the rear hatchback area of the car. Harrell also noticed that the appellant was not familiar with the standard transmission in the Porsche. When they arrived at the station, Harrell asked the appellant for his driver's license. While the officer was standing beside the car, he looked in the car and saw a white male covered with blood lying unconscious in the hatchback portion of the car. Harrell asked the appellant what had happened to the man. The appellant said that he had been in a fight. Upon closer inspection, Harrell determined that the man was dead. Weights were attached to each of the dead man's ankles and his face and hair were saturated with blood. Officer Harrell then handcuffed the appellant and read him his Miranda rights three separate times. He said that the appellant did not appear to be under the influence of drugs or alcohol and that no offer of reward was made to him in order to induce him to make a statement. At this time, the appellant stated that he and the victim had been involved in a drug deal in Demopolis which had gone 'sour.' Drug dealers shot the victim and told the appellant that he could live because he was a black man. The dealer handed the appellant the gun, a .38 caliber handgun, and told him to dispose of the body. The appellant further stated that the gun was under the front seat of the car and that his fingerprints were 'all over it.' A search made of the appellant's person revealed six empty cartridges in his pocket. Some of the clothes that the appellant was wearing were also taken into custody. The blood on the clothes was identified as the same type as the victim's.
 "The appellant made three statements to the police. The details of the statements varied, although in each statement the appellant maintained that the victim was shot by drug dealers. Assistant Chief Charles Burge of the Jackson Police Department testified that the appellant made a statement to him when the appellant arrived at the police station on the evening of November 2, 1988. The statement made by the appellant at this time was similar to the statement he made to Officer Harrell. Assistant Chief Burge also testified that pursuant to a search warrant he had searched the appellant's home. The appellant was living with his aunt at the time of the murder. A search of the appellant's bedroom revealed a book entitled New I.D. in America, a personal diary, and weights similar to those found on the victim. Captain Burge read the following excerpts from the diary found in the room in which the appellant had been living:
 " 'Sunday, October 30, 1988. I will search this house for that gun. If I find it Monday, then I'm going to catch Larry to Prichard [sic]. I'll then walk to my destination. If the car is not there, well, I will break in from the back and wait. After doing the job, leave the place in my new car. Come back after I have gotten the gears right, load up and dump the body.
 " 'Monday, the 31st, 1982 [sic], Porsche 928, dump body, Tuesday, one, get as much money as I can, get car, R-E-G-, abbreviated, "from Chatom, go Dixon Mills, hit Pine Hill." '
 "Investigator Michael Barnett, with the Alabama Bureau of Investigation, testified that two days after the murder, the appellant asked to speak with him. After Barnett apprised the appellant of his Miranda rights, the appellant gave him a detailed statement of his movements for several days before the murder and of his efforts to dispose of the body. In this statement the appellant said that he and the victim had been involved in several drug deals in the past. He stated that after this one big deal, the victim told him that he would give him his Porsche and $7,500.00. The appellant also stated that the victim had been shot by drug dealers who had allowed him, Williams, to live.
 "Evidence from several witnesses established that the appellant had told them that someone 'owed' him a Porsche automobile. One witness also stated that the appellant asked him to help him scare the victim into giving the appellant his Porsche. The appellant was also seen with *Page 1002 
a gun on the afternoon of the murder. Evidence also revealed that the appellant had been in the victim's home prior to the murder. His fingerprints were found in the victim's attic. In one statement the appellant told police that he had broken into the home of the victim and that when the burglar alarm went off he hid in the attic.
 "Evidence was also presented that the appellant wrote out a confession while he was in jail several days after his arrest. Captain Vincent Richardson of the Mobile Police Department testified that Golliday Miller, who had been in the same cell as the appellant, called the Police Department and asked to meet with the investigators who were in charge of the Hasser murder. Captain Richardson and another officer met with Miller. Miller gave them a copy of a confession written, he claimed, by the appellant. The confession was later identified by a handwriting expert as having been written by the appellant. In this confession, the appellant wrote that he had been forced to shoot the victim by drug dealers. The dealers held a gun to his head and said that if he didn't shoot Hasser, they would shoot him. The other details were similar to those in the other three statements made by the appellant. Richardson stated that Miller was not working for the state and that the state made no deal with him to get a statement from the appellant."
627 So.2d at 987-988.
Williams argues that venue was improper in Mobile County, and, therefore, that his conviction must be reversed. We disagree. Although Williams was stopped near Jackson, outside Mobile County, in one of his statements, he said that the murder of Timothy Hasser occurred in Creola, Alabama, which is in Mobile County.
 "Venue may be established by the testimony of one witness. McCrary v. State, 398 So.2d 752
(Ala.Crim.App.), cert. denied, 398 So.2d 757 (Ala. 1981). 'When the state offers evidence tending to show that the crime was committed within the jurisdiction of the court, the question of venue then becomes one for the jury to decide.' [Agee v. State, 465 So.2d 1196, 1204 (Ala.Cr.App. 1984)] (citations omitted). Venue need not be proven by direct evidence, but evidence from which venue may be reasonably inferred is sufficient. Segars v. State, 409 So.2d 1003 (Ala.Crim.App. 1982)."
Jackson v. State, 516 So.2d 726, 738 (Ala.Crim.App. 1985), remanded on other grounds, 516 So.2d 768 (Ala. 1987). Thus, venue was proper in Mobile County.
Williams also contends that the statements made by him to the police were not made voluntarily and, therefore, that they were erroneously admitted into evidence.
 "Pursuant to Alabama law, a statement made subsequent to an arrest is prima facie involuntary and inadmissible at trial; thus, the State must prove the statement was voluntarily made and must lay a Miranda predicate before the statement is admissible. Thomas v. State, 373 So.2d 1167 (Ala. 1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980); Lewis v. State, 295 Ala. 350, 329 So.2d 599 (1976). Whether a waiver is voluntarily, knowingly, and intelligently made depends upon the particular underlying facts and circumstances of each case, including the background, experience, and conduct of the accused — the totality of the circumstances. Chandler v. State, 426 So.2d 477, 478 (Ala.Crim.App. 1982) (citing Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)); Myers v. State, 401 So.2d 288, 291 (Ala.Crim.App. 1981), and cases cited therein. See also Dunkins v. State, 437 So.2d 1349 (Ala.Crim.App.), aff'd, 437 So.2d 1356 (Ala. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984); Harris v. State, 420 So.2d 812 (Ala.Crim.App. 1982); Rogers v. State, 417 So.2d 241 (Ala.Crim.App. 1982); Dolvin v. State, 391 So.2d 677 (Ala. 1980). 'Any clear manifestation of a desire to waive is sufficient. The test is the showing of a knowing intent, not the utterance of a shibboleth.' Lloyd v. State, 45 Ala. App. 178, 184, 227 So.2d 809, 814 (1969) (quoted with approval in Rogers v. State, 417 So.2d at 248). The trial judge need only be convinced from a preponderance of the evidence to find a confession to *Page 1003 
have been voluntarily made. Harris v. State, 420 So.2d at 814. The voluntariness of a statement is a question of law for the court, to be determined upon preliminary proof, taken outside the presence of the jury, and such finding will not be disturbed on appeal unless it appears contrary to the great weight of the evidence, or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App. 1984), and cases cited therein."
Jackson v. State, 516 So.2d 726, 741 (Ala.Cr.App. 1985), remanded on other grounds, 516 So.2d 768 (Ala. 1987). It is clear from the record that the defendant was given the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966), prior to his making each statement to police and investigators concerning the murder. First, Williams was given the Miranda warnings three times by Officer Harrell at the scene of the crime, with a fourth explanation of his rights in "street language," and he indicated to Harrell that he understood those rights and voluntarily waived them. Then, at the station, he was again informed of his rights, before he made another statement. At one point, Williams stopped the questioning and requested an attorney. Later, his mother and father requested that an investigator speak with Williams; his parents were told that Williams had requested an attorney and that the investigators were not allowed to question him further unless he initiated contact with them. After meeting with his parents, Williams initiated contact with the investigator and indicated that he wanted to make a statement. He was again given the Miranda warnings and was asked to sign a statement indicating that he requested to see the investigator.
 "[O]nce an accused asks to remain silent or requests an attorney, all questioning of that accused must cease at that point. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, 'an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him unless the accused himself initiates further communication, exchanges or conversations with the police.' (Emphasis added.) Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)."
Payne v. State, 424 So.2d 722, 724 (Ala.Crim.App. 1982). Clearly, Williams initiated the statement given to the officers and no violation of his rights occurred.
In addition, Williams questions the admissibility of a handwritten statement provided to the State by Golliday Miller, a fellow inmate during Williams's incarceration. An expert testified at trial that the statement was written by Williams; however, Williams argues that the statement was inadmissible because, he says, the State failed to prove that it was voluntarily given. A review of the record reveals that Golliday Miller contacted Officer Richardson with regard to a confession Miller said had been written by Williams. The State offered testimony tending to show that Miller was not an agent of the State when the statement was written and that Miller did not receive any reward from the state for turning over the statement to the State.[1]
 " '[W]hen an accused volunteers a confession to a person who is not a law enforcement official or agent and has no connection whatever with law enforcement authorities, who has no interest whatever in the prosecution of the accused, is not in a position to promise or give the accused anything to compensate for his confession or to harm him for not making a confession, and there was no occasion whatever on the part of the person to whom the confession was made to have threatened the defendant if he did not confess or to make him any promise if he did confess, the confession under such circumstances is voluntary and admissible in evidence. Ellis v. State, Ala.Cr.App., 338 So.2d 428, 432 (1976); Kircheis v. State, 56 Ala. App. 526, *Page 1004 323 So.2d 412 (1975), cert. denied, 295 Ala. 409, 323 So.2d 421.'
 Primm v. State, 473 So.2d 547, 553 (Ala.Cr.App. 1984). See also Warrick v. State, 460 So.2d 320, 323 (Ala.Cr.App. 1984); Hinshaw v. State, 398 So.2d 762, 764 (Ala.Cr.App.), cert. denied, 398 So.2d 766
(Ala. 1981)."
Jackson v. State, 502 So.2d 858, 862 (Ala.Cr.App. 1986).
Williams next contends that he was examined by a State psychiatrist without his attorney being present, and that this examination violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The findings of the psychiatrist were not admitted into evidence, and Williams offered nothing to substantiate his claim that the prosecutor used those findings as a springboard for discovery. We find no error in this regard.
We have considered the fact that Williams was only 19 years old at the time of the murder and his contention that the statute allowing the imposition of the death penalty is unconstitutional as applied to him. First, we note the following:
 "There is . . . no constitutional or statutory provision in Alabama which prohibits the sentencing of a minor to death when he or she is tried as an adult. The United States Supreme Court has not decided that juvenile status puts the death penalty in conflict with the Eighth Amendment. Ice v. Commonwealth, 667 S.W.2d 671
(Ky.), cert. denied, 469 U.S. 860, 105 S.Ct. 192, 83 L.Ed.2d 125 (1984). In Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1
(1982), the Court specifically stated, in footnote 5, '[W]e do not reach the question of whether . . . the Eighth Amendment forbids the execution of a defendant who was 16 at the time of the offense.'
 "This is not the first case in which a person of youthful age has committed a heinous crime and been sentenced to death. See, e.g., Davis v. State, 259 Ala. 212, 66 So.2d 714 (1953); Lynn v. State, 477 So.2d 1365 (Ala.Crim.App. 1984) (affirming a death sentence imposed on a 16-year-old); Dunkins v. State, 437 So.2d 1349 (Ala.Crim.App.), aff'd, 437 So.2d 1356 (Ala. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984). Such cases can be found in most state reporters. See, e.g., Herring v. State, 446 So.2d 1049 (Fla.), cert. denied, 469 U.S. 989, 105 S.Ct. 396, 83 L.Ed.2d 330 (1984); Clay v. State, 143 Fla. 204, 196 So. 462 (1940) (upholding a death sentence imposed on a 16-year-old); Stebbing v. State, 299 Md. 331, 473 A.2d 903, cert. denied, 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984); Eddings v. State, 616 P.2d 1159 (Okla.Cr.App. 1980), rev'd in part on other grounds and remanded, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Commonwealth v. Green, 396 Pa. 137, 151 A.2d 241 (1959); Commonwealth v. Zietz, 364 Pa. 294, 72 A.2d 282
(1950)."
Jackson v. State, 516 So.2d 726, 756 (Ala.Crim.App. 1985), remanded on other grounds, 516 So.2d 768 (Ala. 1987). See alsoEx parte Davis, 554 So.2d 1111, 1113-14 (Ala. 1989) (for a discussion as to the constitutionality of imposing the death penalty on defendants who are 16 or 17 when they commit their crimes). Williams's age when he committed the murder was not a bar to the imposition of the death penalty.
Williams also argues that the State violated Batson v.Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in using peremptory strikes to remove four blacks from the jury venire.[2] The reasons proffered by the State for those four strikes were that an arrest warrant was pending with regard to one of those veniremembers; that one of them knew a defense witness; that one had been arrested for harassment;[3] and that the other admitted to "[f]ighting, cutting," saying, "I've been cut. I've got cut and I've cut people." In justifying his strike of the latter veniremember, the district attorney stated that the veniremember's statement indicated illegal activity.
 "A connection with or a founded suspicion of criminal activity can constitute a *Page 1005 
sufficiently race-neutral reason for the exercise of a peremptory strike. Stephens v. State, 580 So.2d 11 (Ala.Crim.App. 1990); aff'd, 580 So.2d 26 (Ala. 1991); Powell v. State, 548 So.2d 590
(Ala.Crim.App. 1988), aff'd on other grounds, 548 So.2d 605 (Ala. 1989); Lynn v. State, 543 So.2d 709
(1988) cert. denied, 493 U.S. [945] 110 S.Ct. 351, 107 L.Ed.2d 338 (1989)."
Heard v. State, 584 So.2d 556, 560 (Ala.Crim.App. 1991). See also Warner v. State, 594 So.2d 664, 670 (Ala.Cr.App. 1990), reversed, 594 So.2d 690 (Ala.Cr.App. 1992). See also Hawkins v.State, 594 So.2d 181, 187 (Ala.Cr.App. 1991) (race-neutral strike of a black veniremember who knew an expert witness for the defense). We have considered the prosecutor's reasons for striking the four blacks on the jury venire, and we find all the reasons to be race-neutral.
As to the other arguments raised by Williams, we conclude that the Court of Criminal Appeals correctly answered them. In addition, we have searched the record for plain error pursuant to Rule 45, A.R.App.P., and we have found none.
This Court is required by § 13A-5-53, Code of Alabama 1975, to review the propriety of the sentence of death. Our review of the record indicates that the sentence was not the result of "passion, prejudice, or any other arbitrary factor," §13A-5-53(b)(1). Furthermore, we have considered the single aggravating circumstance, that the murder was committed while the defendant was engaged in a robbery, and have weighed it against the mitigating factors of no prior criminal history, an abusive father, and Williams's age when he committed the crime. We find the sentence of death to be proper and not disproportional to the crime. § 13A-5-53(b)(2) and (3). The judgment of the Court of Criminal Appeals is affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES, HOUSTON, STEAGALL and INGRAM, JJ., concur.
[1] According to the State, Miller is presently serving a life sentence for the crime he committed (which was not related to Williams's crime), and he received no reward and no reduction in sentence for turning Williams's statement over to the State. In fact, at trial, Miller "forgot" all facts relating to the written statement, evidently because the State did refuse to give him a "deal."
[2] Three blacks served on the jury.
[3] The prosecutor also stated that a white person had been struck from the venire for a previous arrest.